UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DALE EDWARD MICHAEL, et al., | ) | CASE NO. 1:07CV3818 |
| Plaintiffs, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) ) | |
| UNITED TRANSPORTATION UNION, et al., | ) ) ) | **ORDER** |
| Defendants | ) | |

Before the Court is Plaintiffs' Motion for a Preliminary Injunction (Doc. 16) to restrain Defendant United Transportation Union ("UTU") from consummating a merger between the UTU and the Sheet Metal Workers International Association ("SMWIA"). For the reasons set forth herein, Plaintiffs' Motion is GRANTED.

## FACTUAL HISTORY

The details of the attempted merger between the UTU and the SMWIA are largely in dispute among the parties. However, the general sequence of events giving rise to Plaintiffs' Motion is as follows.

The UTU is a labor union that represents craft employees of rail and bus carriers, among others. In 2004, Paul Thompson ("Thompson") became the president of the UTU and began to explore the possibility of the UTU's merging with another labor union. Thompson ultimately entered into discussions with the SMWIA through its president, Mike Sullivan ("Sullivan"). According to Thompson, other unidentified UTU officers who constituted the Merger Structure Committee joined him for these discussions. (Doc. 20, Thompson Decl. 1.[1]) A merger of the

---

[1] All references to the Thompson Declaration are to Doc. 20.

1

two unions would result in the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART").

In June of 2007, Thompson introduced the finalized Merger Agreement at the Regional Meeting of the UTU in Kansas City, Missouri. He first informed the members of the UTU's Board of Directors ("Board") of the merger and of its basic terms, and requested their approval of the merger at that meeting. Some of the members of the Board who were present for the meeting said that they were not previously aware that a merger was imminent or under serious discussion or that the terms of any merger had been agreed upon. (Doc. 6-6, Futhey Aff. 1-2; Doc. 6-9, Johnson Aff. 1).[2] The UTU Board heard the presentation and asked questions of both Thompson and Sullivan. They learned that the SMWIA and UTU constitutions would become joined in their entirety as the SMART Constitution.[3] Ultimately, the Board voted to submit the Merger Agreement to the UTU membership for its approval or rejection (Thompson Decl. 3), at which point, the merger issue was presented to the rest of the local and national officers who were gathered for the Regional Meeting.

A mailing was sent to the UTU membership on July 17, 2007, in preparation for the vote on the Merger Agreement. The following message was printed on the envelope in bold, block type: "URGENT–UNITED TRANSPORTATION UNION TELEPHONE VOTE ON SHEET METAL UNION MERGER AGREEMENT VOTING INSTRUCTIONS ENCLOSED." (Doc. 6-14). According to Thompson, the packet contained "The Merger Agreement, supporting materials, and telephone electronic voting instructions." (Thompson Decl. 3). The Merger Agreement (Doc. 6-16) included the following language:

---

[2] In his affidavit, Daniel Edward Johnson also indicates that this was his first introduction to the merger "despite the fact that [he] was supposedly a member of the Merger Structure Committee," which Thompson says had met several times to discuss a merger with the SMWIA. (Thompson Decl. 2.)

[3] The remaining issue was the resolution of conflicts between the two constitutions, which, if they arose, would be sent to arbitration for resolution.

2

> Upon approval of this Merger Agreement and of the SMART Constitution (together the "Merger Documents") by the General Executive Council of the SMWIA and the Board of Directors of the UTU, and by the membership of the UTU prior to its regular convention to be held in August 2007, and upon certification of those results by the respective International General Secretary-Treasurers, the merger of SMWIA and UTU to form SMART shall be effective.
>
> . . .
>
> SMART shall be governed by the SMART Constitution, which shall be the SMWIA Constitution amended to implement the provisions of this Agreement. This Merger Agreement is intended only to serve as a mechanism for integration of the two organizations and as a foundation for that Constitution. In the event of any conflict between any provision of this Merger Agreement and any provision of the SMART Constitution, the latter shall govern, and if any dispute should arise that cannot be resolved by the General President of SMWIA (and SMART) and the International President of the UTU (SMART President, Transportation Division), it shall be referred to arbitration as provided in Article XII.

(Merger Agreement pp. 3-4). The packet did not contain a copy of the SMART Constitution, nor did it contain the UTU or SMWIA Constitutions. Thompson contends that the UTU and SMWIA Constitutions were available on the UTU's website during the voting period.

The UTU was scheduled to have its convention in August 2007, at which time the UTU constitution would be revisited and amendments would be considered. In his testimony at the May 28, 2008 hearing, Thompson admitted that the UTU leadership knew at the time of the merger vote that the convention would likely result in amendments to the UTU constitution. (Doc. 102, Evid. Hg. Tr. 23). This made it impossible to know the extent of the conflicts between the UTU and SMWIA Constitutions, the two documents that would form the SMART Constitution. (Id.)

The voting period lasted from July 17, 2007 to August 7, 2007. The UTU estimated that its database, built July 2, 2007, contained the names and addresses of 68,000 members who were eligible to vote for the merger ratification, and it attempted to send ballots to each of those

3

members.[4] (Doc. 12, Fink Decl. 2). Of that rough figure, 12,097 voted, and 8,625 voted for the merger. Based upon that vote, the merger was to be consummated on January 1, 2008. However, as all parties have noted, there was immediately unrest within the UTU that culminated in this litigation.

## PROCEDURAL HISTORY

On November 30, 2007, this matter was transferred from the Southern District of Illinois, where the court found that the proper venue under the Labor Management Reporting and Disclosure Act (LMRDA) was the Northern District of Ohio. At the time of its transfer, the case involved Plaintiffs[5], who object to the method of the merger, and Defendants, the UTU and then-president Thompson. Thompson and the UTU defended against Plaintiffs' claims, filing both an opposition (Doc. 32) to Plaintiffs' Motion for a Temporary Injunction[6] and an opposition (Doc. 18) to Plaintiff's Motion for a Preliminary Injunction. The Court held a hearing on December 27, 2007 on the Motion for a Temporary Restraining Order, which it granted.[7]

Since that time, the officers who were elected at the August UTU convention have taken office, and Thompson has been succeeded as president by Malcolm Futhey (Futhey). Plaintiffs sought to substitute Futhey for Thompson as a defendant (Doc. 42). Futhey had previously submitted a declaration on behalf of Plaintiffs in their Motion for a Preliminary Injunction (Doc. 6-6), and had expressed opposition to Thompson's method of promoting the merger and proceeding to a vote on the issue. Upon Plaintiffs' motion to substitute Futhey, several officers of the UTU who supported the merger sought to intervene as defendants (Doc. 52) because they

---

[4] There was some discussion at the May 28, 2008, evidentiary hearing regarding the number of ballots that were unsuccessfully sent. J.R. Cumby, one of the Intervening Defendants, mentioned that approximately 12,000 ballots were returned as undeliverable.

[5] Plaintiffs are Dale Edward Michael, John R. Hasenauer, Roy G. Arnold, and Jimmy D. Eubanks.

[6] Although Doc. 32 appears on the docket as an Opposition to Motion for Preliminary Injunction, the document itself is titled Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order.

[7] Shortly after the hearing, on January 3, 2008, Plaintiffs moved for summary judgment (Doc. 37), which they later agreed the Court could hold in abeyance pending the outcome of discussions between Plaintiffs and Defendants.

4

were concerned that Futhey, in his capacity as president of the UTU, would not defend against Plaintiffs' claims.

Prior to the Court's ruling on the Motion to Intervene, Plaintiffs and Defendants (Futhey and the UTU) agreed to attempt to produce a SMART constitution so that a new vote could be taken among the membership. This agreement was set forth in terms of an "extension" of the TRO, which amounted to an agreement not to go forward with the merger until the parties had been able to discuss the issues in the case. The parties agreed that this period would last until February 13, 2008. (Doc. 50). On February 1, 2008, the Court granted Plaintiffs' Motion to Substitute (Doc. 56) and held a telephone conference with the parties and Proposed Intervenors, at which time Plaintiffs and Defendants again agreed to forestall the consummation of the merger pending a discovery period on the Motion to Intervene and further discussion about the resolution of the issues in the case. The parties agreed that said extension would last until ten days after the Court ruled on the Motion to Intervene. (Docs. 57, 60).

The Court held an evidentiary hearing on the Motion to Intervene on May 28, 2008, at which time the Intervenors presented testimony and Plaintiffs and Defendants cross-examined their witnesses. On June 18, 2008, the Court granted the Motion to Intervene as to all of the current UTU office-holders, and denied the motion as to Thompson. (Doc. 103). Accordingly, Plaintiffs' request for a Preliminary Injunction is now ripe for the Court's consideration.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, this Court must review four factors:

> (1) the plaintiffs' likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.

5

*Abney v. Amgen, Inc.,* 443 F.3d 540, 546 (6th Cir. 2006) (citation and quotation omitted).  These four issues are "factors to be balanced, not prerequisites that must be met."  *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985)).

## LEGAL ANALYSIS

**1. Likelihood of Success on the Merits**

> The Sixth Circuit has described the movant's burden under this prong as follows:
>
> The first factor to consider is whether the plaintiff has demonstrated a strong likelihood of success on the merits.  A party is not required to prove his case in full at a preliminary injunction hearing.  However, in order to establish success on the merits of a claim, a plaintiff must show more than a mere possibility of success.  It is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 543 (6th Cir. 2007) (citations and quotations omitted).

In their complaint, Plaintiffs seek a declaration that they were deprived of a "meaningful vote" on the merger at issue.  The Court finds that Plaintiffs have shown a substantial likelihood of success on their claim that they were deprived of a meaningful vote in the merger referendum in violation of the LMRDA.

Section 411(a)(1) of the LMRDA guarantees equal rights in voting to all members of labor unions:

> Equal Rights. Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1). This provision

> is intended to guarantee that unions are run democratically and to assure full and active participation by the rank and file in the affairs of the union.  Nonetheless, the Sixth Circuit has recognized the need to exercise what Judge Wisdom referred to as a sound reluctance to interfere in internal union affairs.  A challenge to a union's political structure must be weighed from a practical viewpoint with due regard to the functions performed by unions as collective bargaining representatives, to the need for autonomy in selecting the most appropriate political structures, as well as to democratic theory and individual rights.
>
> The LMRDA guarantees union members not only an equal vote, but also a meaningful vote.  Whether members were afforded a meaningful vote depends on whether they were given adequate notice and information regarding the subject matter and nature of the vote and whether they had enough time and opportunity to mount effective support or opposition to the leadership's position.

*Morris v. Internat'l Brotherhood of Locomotive Engineers,* 165 F.Supp.2d 662, 667 (N.D.Ohio 2001) (citations and quotations omitted).  "However, this Court is not unfettered in its determination of what constitutes 'full and active participation' or a 'meaningful vote.'" *Blanchard v. Johnson*, 532 F.2d 1074, 1078 (6th Cir. 1976).  In other words, the rights guaranteed by Title I of LMRDA are subject to reasonable rules and regulations by the union. *Calhoon v. Harvey*, 379 U.S. 134, 138-39 (1964).  "*Blanchard* merely requires full disclosure of the *terms of all proposals* submitted to the membership for a referendum in order to ensure that the vote is meaningful and that the membership has fully participated in the decision making process." *Corea v. Welo*, 937 F.2d 1132, 1140 (6th Cir. 1991) (emphasis in original).

Defendants concede that the SMART Constitution was never provided to UTU members prior to their approval of the Merger Agreement.  As more fully detailed below in describing the harm suffered by Plaintiffs, the Court finds that the failure to provide such relevant information constituted a failure to disclose the relevant terms of the proposal between the parties.  Plaintiffs, therefore, have demonstrated a substantial likelihood of success on their claim that they were deprived of a meaningful vote.

7

**2. Irreparable Harm to Plaintiffs**

Generally, irreparable harm is present if the plaintiff's harm "is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). However, even an injury compensable by money damages may be deemed irreparable "if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). Courts have found irreparable harm when a union member has cast a vote based upon insufficient information. *See, e.g., Petrazzulo v. Lowen*, 534 F.Supp. 173, 176 (S.D.N.Y.1982) ("Irreparable harm will naturally flow to all union members who exercised their right to vote on the desegregation of assets without all pertinent financial information.").

With regard to the irreparable aspect of this factor, the Court has little problem finding that it has been satisfied. No amount of legal maneuvering will be able to "undo" the merger once it has been completed.

The parties, however, differ over whether any harm has occurred. While Plaintiffs contend that they have been deprived of a meaningful vote, Defendants argue that no deprivation has occurred. The Court finds that substantial evidence exists to support Plaintiffs' assertions.

The Merger Agreement entered into by the SMWIA and the UTU provides in relevant part as follows:

> Upon approval of this Merger Agreement and of the SMART Constitution (together the "Merger Documents") by the General Executive Council of SMWIA and the Board of Directors of UTU, and by the membership of UTU prior to its regular convention … the merger of SMWIA and UTU to form SMART shall be effective.

8

Doc. 6-16 at 3.  If the above-described documents were not approved by both sides, the Agreement would be terminated.  *Id.*  The Agreement also provides as follows:

> This Merger Agreement is intended only to serve as a mechanism for integration of the two organizations and as a foundation for [the SMART] Constitution.  In the event of a conflict between any provision of this Merger Agreement and any provision of the SMART Constitution, the latter shall govern, and if any dispute should arise that cannot be resolved [by the parties], it shall be referred to arbitration[.]

It is this latter paragraph that is seized upon by Defendants.  In opposition, Defendants contend that the Merger Agreement clearly laid out the *process* that would create the SMART Constitution: the UTU Constitution would be added to the SMWIA Constitution and any conflicts would be resolved through arbitration.  Defendants contend that approval of this process, which was fully explained to voting members of the UTU, was sufficient to provide the members with a meaningful vote.  The Court disagrees.

First, the plain language of the Merger agreement required approval of the SMART Constitution.  The document repeatedly refers to the plural, "Merger Documents."  Defendants would ignore this language and require only that the process of creating the SMART Constitution be approved by a vote of the UTU membership.  If this were the intent of the parties, they could have drafted the Agreement in such a manner.  They did not.

Furthermore, even accepting Defendants' proffered interpretation, Plaintiffs have demonstrated that their vote was not meaningful.  While a vote of the membership approved the *process* by which the SMART Constitution would be created, UTU members were not provided any factual information that would place this process in context.   At one point in time, Thompson recognized two possible conflicts between the Constitutions.  Doc. 102 at 22.  During questioning, Thompson stated as follows:

9

> Q. Now, why didn't the parties resolve all possible constitutional conflicts and create a brand new document prior to presenting it to the membership?
>
> A. We didn't know of any disputes, and we couldn't do that for the fact that we had a convention coming up in August of 2007 subsequent to the merger being approved. And at this convention, the delegates submitted proposals to change existing provisions within the UTU constitution. And until that convention was completed and we seen if any were changed that were [possibly] in conflict, we could not put out the -- rewrite any constitutional changes until after our convention.

*Id.* at 23. Thompson, therefore, effectively conceded that it was impossible to inform the UTU membership of the impact of the merger on the UTU Constitution until after the convention. Even after that convention had concluded, UTU members still were not provided a SMART Constitution. Moreover, a review by the attorneys involved in the merger revealed the possibility of "40-odd conflicts" between the two Constitutions. *Id*. at 35.

The Court, however, need not resolve the issue of the actual number of conflicts. Rather, the Court need only note that the voting members of the UTU were not provided information about the conflicts. Instead, in a best case scenario for Defendants, some of the voting members of the UTU were able to access both the UTU and SMWIA Constitutions via the internet. This was the sole mechanism for viewing both documents because hard copies of the two constitutions were never provided. In order to approve the SMART Constitution as required by the Merger Agreement, UTU members would have been required to perform a side-by-side comparison of the two existing constitutions, identify possible conflicts between the two documents, and then be satisfied that arbitrating these conflicts would lead to an acceptable result. Requiring such extensive independent analysis from the UTU electorate deprived their vote of any meaningful value.

Members were forced to vote with little or no knowledge of the conflicts between the two Constitutions that could ultimately lead to a SMART Constitution with terms very different from

10

that of the current UTU Constitution. The SMART Constitution would then govern their working lives for the foreseeable future. Absent information about the possible changes to their own governing document, the UTU members' votes cannot be said to be meaningful. Accordingly, the Court finds that UTU members were harmed through the failure of their own elected officials to provide them adequate information prior to the vote on the Merger agreement.

### 3. Substantial Harm to Others

The Court finds that no substantial harm to others exists if an injunction issues.

> "No irreparable harm will befall the Union by a preliminary injunction forbidding the merger question from being taken up at the convention or effectuated. To the contrary, the Union membership, which is the Union, will benefit from an injunction whose purpose it is to insure that the membership has a democratic voice which it has not to date been given."

*Cefalo v. Moffett*, 333 F.Supp. 1283, 1288 (D.C.D.C. 1971). Similar to the *Cefalo* matter, no harm will befall the UTU if an injunction prohibits the merger from being effectuated. Instead, an injunction will ensure that the merger will not take place until a meaningful vote on the SMART Constitution has occurred, as required by the Merger Agreement.

Furthermore, the Court cannot find any cognizable harm that would flow to SMWIA. As detailed in the Merger Agreement, the merger was dependent upon a vote of approval by the UTU membership. Until such a vote that complies with the LMRDA has taken place, SMWIA has no legally enforceable rights under the Merger Agreement. Consequently, no legally cognizable harm flows to SMWIA from the issuance of an injunction in this matter.

### 4. Impact on the Public Interest

Finally, the Court finds that the public interest weighs in favor of issuing a preliminary injunction. "The clear policy of the [LMRDA] is to bid farewell to the regime of benevolent well-meaning union autocrats and to give favor to a system of union democracy with its

11

concomitants of free choice and self-determination." *Blanchard v. Johnson*, 388 F.Supp. 208, 215 (N.D.Ohio 1974), *aff'd in relevant part*, 532 F.2d 1074 (6th Cir. 1976).  Furthermore, "an informed public is the essence of working democracy." *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983).  "Democracy depends on a well-informed electorate, not a citizenry … limited in its ability to discuss and debate … issues." *Buckley v. Valeo*, 424 U.S. 1, 49, fn. 55 (1976).  Having found that there is substantial likelihood that Plaintiffs will demonstrate that they were deprived of a meaningful vote, the public interest supports the issuance of an injunction.  Through such an injunction, the right to a meaningful vote will not be cast aside in favor of expediency.

**5. Posting of Bond**

Finally, Plaintiffs urge that they should not be required to post bond upon the issuance of the injunction.  The Court agrees.

Fed.R. Civ.P. 65(c) provides as follows:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

The Sixth Circuit has interpreted this language and concluded that a district court has the power not only to set the amount of security but also to dispense with any security requirement whatsoever where the restraint will do the defendant "no material damage[.]" *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810, 816 (6th Cir. 1954), *cert. denied*, 349 U.S. 930 (1955).  Furthermore, the Sixth Circuit has consistently held that while a trial court must exercise the discretion required of it by Fed.R. Civ.P. 65(c) and expressly consider the question of requiring a bond before issuing a preliminary injunction, the actual requirement of a bond is discretionary with the trial judge.  *See, e.g., Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir.

12

1978); *Aluminum Workers Internat'l Union v. Consolidated Alum. Corp.*, 696 F.2d 437, 446 (6th Cir. 1982); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982) (amount of security given by applicant for an injunction is matter within discretion of trial court, which may require no security at all).  In addition, some Federal Circuits have acknowledged a "public interest" or "public policy" exception to Fed.R. Civ.P. 65(c).  *See Crowley v. Local No. 82,* 679 F.2d 978, 1000 (1st Cir. 1982) *rev'd on other grounds*, 467 U.S. 526 (1984).

In this matter, the Court has considered the need for bond to be posted.  The Court has concluded that no material damage will accrue to Defendants if the issuance of this injunction is ultimately found to be improper.  Furthermore, the Court finds the policy statement in *Crowley* to be persuasive.  "[A] bond requirement would affect enforcement of Title I rights adversely because individual union members are at a great financial disadvantage in litigating against unions."  *Id*. at 1000-1001.  The Court, therefore, finds that based upon the facts presented that bond would not be appropriate.  Accordingly, Plaintiffs shall not be required to post security upon the issuance of this injunction.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is GRANTED.  Defendants are preliminarily ENJOINED from consummating the merger of the UTU with the SMWIA pursuant to the 2007 Merger Agreement.

IT IS SO ORDERED.


June 25, 2008                                                                             /s/ John R. Adams
Date                                                                                              Judge John R. Adams
                                                                                                      United States District Judge