UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DALE EDWARD MICHAEL, et al., | ) | CASE NO. 1:07CV3818 |
| Plaintiffs, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) ) | |
| PAUL THOMPSON, et al., | ) | **ORDER** |
| Defendants | ) ) ) ) | |

This matter is before the Court after Intervenors' appeal of the Court's decision granting Plaintiffs' Motion for a Preliminary Injunction. It has reviewed the parties' briefs on the subject of jurisdiction pending Intervenors' appeal as well as relevant case law, and has concluded, for the reasons set forth herein, that the interests of justice are best served by the imposition of a stay pending a decision from the Sixth Circuit Court of Appeals on this Court's jurisdiction to decide Plaintiffs' requests for injunctive relief.

**Factual Background**

The statement of relevant facts was set forth in this Court's Order granting Plaintiffs' Motion for a Preliminary Injunction (Doc. 105), and is reiterated herein for the readers' convenience. The United Transportation Union ("UTU") is a labor union that represents craft employees of rail and bus carriers, among others. In 2004, Paul Thompson ("Thompson") became the president of the UTU and began to explore the possibility of the UTU's merging with another labor union. Thompson ultimately entered into discussions with the Sheet Metal Worker

International Association ("SMWIA") through its president, Mike Sullivan ("Sullivan"). According to Thompson, other unidentified UTU officers who constituted the Merger Structure Committee joined him for these discussions. (Doc. 20, Thompson Decl. 1[1].) A merger of the two unions would result in the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART").

In June of 2007, Thompson introduced the finalized Merger Agreement at the Regional Meeting of the UTU in Kansas City, Missouri. He first informed the members of the UTU's Board of Directors ("Board") of the merger and of its basic terms and requested their approval of the merger at that meeting. Some of the members of the Board who were present for the meeting have said that they were not previously aware that a merger was imminent or under serious discussion or that the terms of any merger had been agreed upon. (Doc. 6-6, Futhey Aff. 1-2; Doc. 6-9, Johnson Aff. 1).[2] The UTU Board heard the presentation and asked questions of both Thompson and Sullivan. They learned that the SMWIA and UTU Constitutions would become joined in their entirety as the SMART Constitution.[3] Ultimately, the Board voted to submit the Merger Agreement to the UTU membership for its approval or rejection (Thompson Decl. 3), at which point, the merger issue was presented to the rest of the local and national officers who were gathered for the Regional Meeting.

A mailing was sent to the UTU membership on July 17, 2007, in preparation for the vote on the Merger Agreement. The following message was printed on the envelope in bold, block type: "URGENT–UNITED TRANSPORTATION UNION TELEPHONE VOTE ON SHEET

---

[1] All references to the Thompson Declaration are to Doc. 20.
[2] In his affidavit, Daniel Edward Johnson also indicates that this was his first introduction to the merger "despite the fact that [he] was supposedly a member of the Merger Structure Committee," which Thompson says had met several times to discuss a merger with the SMWIA. (Thompson Decl. 2.)
[3] The remaining issue was the resolution of conflicts between the two constitutions, which, if they arose, would be sent to arbitration for resolution.

METAL UNION MERGER AGREEMENT VOTING INSTRUCTIONS ENCLOSED." (Doc. 6-14).  According to Thompson, the packet contained "The Merger Agreement, supporting materials, and telephone electronic voting instructions."  (Thompson Decl. 3).  The Merger Agreement (Doc. 6-16) included the following language:

> Upon approval of this Merger Agreement and of the SMART Constitution (together the "Merger Documents") by the General Executive Council of the SMWIA and the Board of Directors of the UTU, and by the membership of the UTU prior to its regular convention to be held in August 2007, and upon certification of those results by the respective International General Secretary-Treasurers, the merger of SMWIA and UTU to form SMART shall be effective.
>
> . . .
>
> SMART shall be governed by the SMART Constitution, which shall be the SMWIA Constitution amended to implement the provisions of this Agreement. This Merger Agreement is intended only to serve as a mechanism for integration of the two organizations and as a foundation for that Constitution.  In the event of any conflict between any provision of this Merger Agreement and any provision of the SMART Constitution, the latter shall govern, and if any dispute should arise that cannot be resolved by the General President of SMWIA (and SMART) and the International President of the UTU (SMART President, Transportation Division), it shall be referred to arbitration as provided in Article XII.

(Merger Agreement pp. 3-4).  The packet did not contain a copy of the SMART Constitution, nor did it contain the UTU or SMWIA Constitutions.  Thompson contends that the UTU and SMWIA Constitutions were available on the UTU's website during the voting period.

The UTU was scheduled to have its convention in August 2008, at which time the UTU constitution would be revisited and amendments would be considered.  In his testimony at the May 28, 2008 hearing, Thompson admitted that the UTU leadership knew at the time of the merger vote that the convention would likely result in amendments to the UTU constitution. (Doc. 102, Evid. Hg. Tr. 23).  This made it impossible to know the extent of the conflicts between the UTU and SMWIA Constitutions, the two documents that would form the SMART Constitution.  (Id.)

The voting period lasted from July 17, 2007 to August 7, 2007. The UTU estimated that its database, built July 2, 2007, contained the names and addresses of 68,000 members who were eligible to vote for the merger ratification, and it attempted to send ballots to each of those members.[4] (Doc. 12, Fink Decl. 2). Of that rough figure, 12,097 voted, and 8,625 voted for the merger. Based upon that vote, the merger was to be consummated on January 1, 2008. However, as all parties have noted, there was immediately unrest within the UTU that culminated in this litigation.

Shortly before the Court ruled on Plaintiffs' Motion for a Preliminary Injunction, Intervenors filed a Motion to Dismiss for lack of subject matter jurisdiction. They argued that, because the elections held in late 2007 were based upon the successful merger of the UTU and the SMWIA into SMART, Plaintiffs' efforts in this litigation are effectively intended to undo the results of a union election, which they argue would be prohibited under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). The Court has denied that motion. (*See* Doc. 118.)

Immediately after the Court granted Plaintiffs' Preliminary Injunction, Intevenors filed an appeal before the Sixth Circuit Court of Appeals challenging this Court's jurisdiction in granting the preliminary injunction. (See Doc. 113 at 3.) The Court ordered that the parties brief the issue of whether it had jurisdiction to decide Intervenors' Motion to Dismiss in light of the pending appeal, which Plaintiffs, Defendants and Intervenors did. All were in agreement that the case law supported this Court's continued exercise of jurisdiction despite the pending appeal. Each of those briefs generally set forth the law in cases in which there is an interlocutory appeal

---

[4] There was some discussion at the May 28, 2008, evidentiary hearing regarding the number of ballots that were unsuccessfully sent. J.R. Cumby, one of the Intervening Defendants, mentioned that approximately 12,000 ballots were returned as undeliverable.

pending, concluding that an interlocutory appeal from the granting of injunctive relief does not deprive the district court of jurisdiction over the remainder of the case.

Upon representation of Intervenors' counsel, Intervenors are raising before the Sixth Circuit the issue of this Court's subject matter jurisdiction over the instant litigation, in particular its granting of the preliminary injunction.  (Doc. 113.)  Intervenors contend that, because a briefing schedule has not yet been set by the Sixth Circuit, a decision is not imminent from that court, and this Court should decide the issues before it despite the pending appeal.

**Legal Analysis**

The Court has before it the question of whether to proceed in this case or to stay these proceedings in anticipation of the appellate court's ruling on this Court's jurisdiction.  It is clear that the Court has the power to impose a stay: "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Landis v. North Amer. Co.*, 299 U.S. 248, 254-55 (1936).  *See also Rhines v. Weber*, 544 U.S. 269, 276 (2005); *Ohio Envtl. Council v. United States Dist. Court*, 565 F.2d 393 (6th Cir. 1977).

In *Ohio Environmental Council*, the appellate court cited *Landis* for the proposition that the decision to impose a stay "rests with the sound discretion of the District Court" but also noted that a party to court proceedings "has a right to a determination of its rights and liabilities without undue delay."  *Ohio Envtl. Council*, 565 F.2d at 396.  The court then concluded that the district court had abused its discretion in staying the case because the stay interrupted a timetable for resolution imposed by statute, and the structure of the stay was such that it would "place [the]

case in limbo for years," when it had already been subject to various stays for more than a year prior.

In this case, the Court has already granted Plaintiffs' Motion for a Preliminary Injunction. The only issue that would be pending should the Court not impose a stay would be any motion by Plaintiffs for a permanent injunction. Intervenors have already appealed the granting of the Preliminary Injunction. The record in this matter reflects that they have challenged the Court's jurisdiction in granting injunctive relief, and clearly they were entitled to challenge the merits of that injunctive relief, though the record does not reflect whether they have so argued.

Were the Court to impose a stay at this point in the proceedings, the preliminary injunction would remain in place. A permanent injunction would only be denied were circumstances among the parties to have changed substantially, or were new discovery to reveal information that would change the Court's calculus in evaluating the parties' respective claims. No such change of circumstances is apparent to the Court, nor have the parties contemplated conducting further discovery into the events giving rise to this litigation. The Sixth Circuit's decision in this matter would either affirm the Court's exercise of jurisdiction, in which case the Court would immediately permit briefing on the issue of the permanent injunction, or would reverse the Court's exercise of jurisdiction, at which time the Court would lack jurisdiction and all of its decisions heretofore would become moot. The Court perceives no harm that would come to the parties from its stay of the proceedings until the Sixth Circuit has made that decision.

While it may be strategically beneficial to Intervenors to have contemporaneous appeals pending were the Court to decide Plaintiffs' request for a permanent injunction, this is not a consideration of importance to the Court in deciding whether to impose a stay. Rather, the Court's concern is for the determination of the rights and liabilities of the parties. Intervenors'

desire to have contemporaneous appeals, which Plaintiffs and possibly Defendants would then have to defend against, is not part of that equation.

Therefore, this matter is STAYED pending the Sixth Circuit's determination of the question of this Court's jurisdiction.

IT IS SO ORDERED.


DATE:   October 20, 2008                */s/ John R. Adams*
                                                         Judge John R. Adams
                                                         UNITED STATES DISTRICT COURT